*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SERGIO LOVE,

      Plaintiff-Appellee,

v

MICHAEL NOTORIANO,

      Defendant-Appellant,

and

DAVID POMEROY, CITY OF DETROIT, and
CITY OF ST CLAIR SHORES,

      Defendants.

UNPUBLISHED
November 7, 2019

No. 344227
Wayne Circuit Court
LC No. 16-008118-NO

Before: FORT HOOD, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

Defendant Michael Notoriano, a former St. Clair Shores police officer, appeals as of right the trial court's order granting in part and denying in part his motion for summary disposition under MCR 2.116(C)(10). The court denied summary disposition with respect to plaintiff's claim under 42 USC 1983 ("§ 1983") for violation of plaintiff's Fourth Amendment rights on the basis of excessive force and with respect to plaintiff's claims for conversion, intentional infliction of emotional distress, and ethnic intimidation. On appeal, defendant[1] argues that the trial court erred by finding that a genuine issue of material fact existed to defeat defendant's claim of qualified immunity. We disagree, and therefore affirm the trial court's order.

---

[1] Defendant Notoriano is the only party-defendant participating in this appeal. As used in this opinion, all references to "defendant" refer to defendant Notoriano only.

-1-

# I. FACTS AND PROCEEDINGS

On July 20, 2013, defendant's 16-year-old daughter was the victim of a robbery in which an African-American man pushed her off her bicycle and stole her cell phone. According to plaintiff, Dwayne Weathington committed the robbery and sold the phone to plaintiff's friend, Robert Cureton. Plaintiff denied having any knowledge of the robbery or the phone's origin.

On July 21, 2013, defendant was preparing to start his afternoon shift as a St. Clair Shores police officer when he received a Find-My-Phone alert indicating that the stolen phone was at a Citgo gas station in Detroit. Defendant took personal leave time from his employment to follow up with the alert. While accompanied by his friend, David Pomeroy, a city of Detroit police officer, the two drove to the Citgo station in defendant's Ford F-150 pickup truck. Plaintiff, Cureton, and plaintiff's brother were present at the gas station in a GMC Denali sport utility vehicle (SUV). When defendant and Pomeroy arrived, Cureton was pumping gas and plaintiff was walking out of the gas station store, carrying a bottle of water that he had purchased. Pomeroy approached Cureton, and defendant approached plaintiff. According to plaintiff, defendant drew his gun and addressed plaintiff using a racial slur. Defendant then grabbed plaintiff by the back of his shirt, held his gun directly against the back of plaintiff's head, and pushed plaintiff against the SUV. Defendant conducted a pat-down search of plaintiff, returned his gun to the back of plaintiff's neck, and pushed him against the F-150. Meanwhile, Pomeroy searched Cureton and found a gun concealed behind his back. Pomeroy seized the gun and pushed Cureton against the truck. Pomeroy took a phone from Cureton's pocket. Defendant and Pomeroy then released plaintiff and Cureton. According to plaintiff, Pomeroy told defendant "to get rid of the plate," following which defendant bent the license plate on the F-150 to obscure its view. Defendant and Pomeroy then left the station in the F-150. According to plaintiff, defendant attempted to back the F-150 over him and Cureton before he drove away from the station.

Plaintiff and Cureton brought this action asserting multiple claims against defendant, Pomeroy, and the cities of Detroit and St. Clair Shores. The trial court dismissed Cureton's claims and plaintiff's claims against the municipal defendants. The trial court granted in part and denied in part defendant's motion for summary disposition. As relevant to this appeal, the trial court denied defendant's motion with respect to plaintiff's § 1983 claim alleging a Fourth Amendment violation on the basis of excessive force. The sole issue on appeal is whether the trial court erred by finding that a genuine issue of material fact existed to defeat defendant's entitlement to qualified immunity.[2]

---

[2] The trial court also denied summary disposition with respect to plaintiff's common-law claims against defendant for conversion and intentional infliction of emotional distress, and also plaintiff's statutory claim for ethnic intimidation. Defendant filed this claim of appeal pursuant to MCR 7.202(6)(a)(v), which defines a "final order" for purposes of an appeal of right under MCR 7.203(A)(1) as including "an order denying governmental immunity to a governmental party, including a governmental agency, official, or employee . . . or an order denying summary disposition under MCR 2.116(C)(10) based on a claim of governmental immunity[.]" Although

## II. ANALYSIS

Whether a defendant is entitled to qualified immunity is a question of law that this Court reviews de novo. *Thomas v McGinnis*, 239 Mich App 636, 644; 609 NW2d 222 (2000). "A motion for summary disposition pursuant to MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Stock Bldg Supply, LLC v Crosswinds Communities*, 317 Mich App 189, 198; 893 NW2d 165 (2016) (citation and quotation marks omitted). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Id.* (citation and quotation marks omitted). Summary disposition under MCR 2.116(C)(10) is proper when there is no "genuine issue regarding any material fact." *Id.* (citation omitted).

"Any person who, under color of state law, deprives another of rights protected by the constitution or laws of the United States is liable under 42 USC 1983." *Morden v Grand Traverse Co*, 275 Mich App 325, 332; 738 NW2d 278 (2007). "Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes." *York v Detroit*, 438 Mich 744, 757-758; 475 NW2d 346 (1991).

Qualified immunity is a recognized defense against claims for damages under § 1983 for alleged violations of federal rights. *Morden*, 275 Mich App at 340. "An official has qualified immunity from suits under 42 USC 1983 when the official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Holeton v City of Livonia*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket Nos. 341624 and 341847); slip op at 6, quoting *Kisela v Hughes*, ___ US ___, ___; 138 S Ct 1148, 1152; 200 L Ed 2d 449 (2018). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Holeton*, ___ Mich App at ___; slip op at 6, quoting *Pearson v Callahan*, 555 US 223, 231; 129 S Ct 808; 172 L Ed 2d 565 (2009). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 US at 231 (quotation marks and citation omitted). The doctrine of qualified immunity "applies an objective standard to the conduct of defendants, not to their state of mind." *Morden*, 275 Mich App at 340. The doctrine "shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v Haugen*, 543 US 194, 198; 125 S Ct 596; 160 L Ed 2d 583 (2004).

---

the trial court denied summary disposition of plaintiff's common-law and statutory claims on grounds unrelated to immunity, an appeal from an order described in MCR 7.202(6)(a)(*v*) "is limited to the portion of the order with respect to which there is an appeal of right," MCR 7.203(A)(1), and defendant acknowledges in his brief that he filed his claim of appeal only from the portion of the trial court's order that denied him qualified immunity.

To defeat qualified immunity, the court must find that the plaintiff can establish two elements. First, "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Second, "if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Holeton*, ___ Mich App at ___; slip op at 7, quoting *Pearson*, 555 US at 232. In the first prong of this two-prong test, the court "must concentrate at the outset on the definition of the constitutional right and [then] determine whether, on the facts alleged, a constitutional violation could be found." *Solomon v Auburn Hills Police Dep't*, 389 F3d 167, 172-173 (CA 6, 2004) (quotation marks and citation omitted). "After the constitutional right has been defined, [the court] still must inquire whether a violation of [the plaintiff's] right to be free from excessive force could be found." *Id.* at 173. "The focus of the inquiry is on whether the official had 'fair notice that her conduct was unlawful;' and, for that reason, the reasonableness of the act must be judged against the backdrop of the law at the time of the conduct." *Holeton*, ___ Mich App at ___; slip op at 7, quoting *Kisela*, ___ US at ___; 138 S Ct at 1152. "The allegations and facts must show that it would have been clear to a reasonable official in the defendant's position that his or her conduct was unlawful under the situation that he or she confronted." *Id*. Courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 US at 236.

With respect to the first inquiry, whether the facts alleged or proved establish violation of a constitutional right, plaintiff argues that defendant violated his right to be free from excessive force by law enforcement officers. A police officer may conduct an investigatory stop and brief detention of a person if the officer has reasonable suspicion that a crime is in progress or has been committed. *Terry v Ohio*, 392 US 1, 21-22, 30-31; 88 S Ct 1868; 20 L Ed 2d 889 (1968). The Fourth Amendment of the United States Constitution protects a person from being subject to excessive physical force by law enforcement officers. *Latits v Phillips*, 878 F3d 541, 547 (CA 6, 2017). "Within reasonable limits, officers enjoy the discretion to determine the amount of force required by the circumstances and they are not guilty of wrong unless they arbitrarily abuse the power confided in them." *Alexander v Riccinto*, 192 Mich App 65, 69; 481 NW2d 6 (1991).

Excessive-force claims are analyzed under an "objective reasonableness" standard. *Graham v Connor*, 490 US 386, 388; 109 S Ct 1865; 104 L Ed 2d 443 (1989). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Recognizing that the test of reasonableness under the Fourth Amendment is not capable of precise definition, the Supreme Court offered guidance in *Graham*, noting that its application "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397. The conduct must be reviewed under the totality of the circumstances confronting the officers. *Dunigan v Noble*, 390 F3d 486, 493 (CA 6, 2004). "An

officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*., quoting *Graham*, 490 US at 397.

The second inquiry is whether the plaintiff's right to be free from excessive force "was clearly established at the time of defendant's alleged misconduct." *Holeton*, ___ Mich App at ___; slip op at 7, quoting *Pearson*, 232 US at 232. The United States Supreme Court stated in *White v Pauly*, 580 US ___, ___; 137 S Ct 548, 552; 196 L Ed 2d 463 (2017):

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v al–Kidd,* 563 US 731, 742, 131 S Ct 2074, 179 L Ed 2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v Creighton,* 483 US 635, 640, 107 S Ct 3034, 97 L Ed 2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.,* at 639, 107 S Ct 3034.

The Court in *White* concluded that the circuit court "misunderstood the 'clearly established' analysis" where the court "failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." *White*, 137 S Ct at 552.

In *Dorsey v Barber*, 517 F3d 389 (CA 6, 2008), the defendant officer observed that the plaintiffs matched the description of subjects in a be-on-lookout (BOLO) broadcast. *Id*. at 391-392. The plaintiffs did not comply with the defendant's initial instructions to stop and lie on the ground. The defendant "drew his service weapon from its holster to control the situation until a back-up unit arrived." The defendant kept his gun out until backup arrived. *Id*. at 392. Later events proved that the plaintiffs were not the suspects in the BOLO. *Id*. at 393. After concluding that the defendant had sufficient reasonable suspicion to detain the plaintiffs in a *Terry* stop, the court addressed the plaintiffs' excessive-force claim. *Id*. at 398. The court concluded that the defendant was entitled to qualified immunity because he did not become aware that the plaintiffs were not the suspects in the BOLO during the time he had his gun on display. The court remarked that the officer used "a mere *show* of force" that did not result in touching the plaintiffs. *Id*. at 402. The court remarked that the means used by the defendant "were more intrusive than necessary," but found that a reasonable officer in his situation could believe that "brandishing a firearm and ordering two suspects . . . to lie on the ground for a period of two minutes, without firing the weapon or physically injuring them in any way or even touching them—were not violative of the suspects' constitutional rights." *Id*.

The evidence in the instant case, viewed in a light most favorable to plaintiff, showed that defendant approached plaintiff as plaintiff was walking from the gas station store to the SUV. Plaintiff was holding a plastic water bottle that he had purchased. When plaintiff asked what he had done, defendant told him to "shut the f**k up." Defendant grabbed plaintiff by his shirt, shoved a gun against the back of his head, and pushed him against the vehicle. Plaintiff did not know where defendant had the gun while defendant conducted a pat-down search of plaintiff's

person, but defendant returned the gun to plaintiff's head after the search. After defendant and Pomeroy released plaintiff and Cureton, defendant bent the license plate on his truck to conceal the number. Defendant then attempted to back over plaintiff and Cureton with his truck.

Considering the first of the three factors stated in *Graham*, 490 US at 396, the trial court determined that the crime under investigation was relatively minor, viewing it as involving possession of a stolen cell phone. Arguably, the crime under investigation was more serious, because it also involved an unarmed robbery. The second factor considers whether the suspect poses an immediate threat to the safety of others. On the one hand, defendant could reasonably anticipate that the persons from the SUV might use physical force to challenge him because they were suspects in the robbery of the phone. Additionally, Cureton was in possession of a gun. Plaintiff, however, was separated from the other persons in the van. He was walking from the store to the vehicle, carrying a bottle of water, while Pomeroy was detaining Cureton. Plaintiff was not acting in a threatening manner before defendant approached him, and when defendant approached plaintiff with his gun drawn, plaintiff did not react with anger or violence. Regarding the third factor, plaintiff did not resist defendant.[3]

Considering these factors, and defendant's actions, objectively, defendant's use of force could be considered reasonable with respect to initially holding his gun in the low-ready position, and also with respect to pushing plaintiff against the SUV for the pat-down search. But the evidence supports a finding that defendant's use of force became excessive under the circumstances when he held his gun directly against the back of plaintiff's head, especially after the pat-down search was completed.

Regarding the gun-pointing, "the use of guns in connection with a [*Terry*] stop is permissible where the police reasonably believe they are necessary for their protection . . . ." *United States v Mosley*, 743 F3d 1317, 1329 (CA 10, 2014). However, "pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa v City and Co of San Francisco*, 598 F3d 528 (CA 9, 2010). Very generally, courts have "held that pointing guns at persons who are compliant and present no danger is a constitutional violation," but "courts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police." *Baird v Renbarger*, 576 F3d 340, 346 (CA 7, 2009).[4]

---

[3] If plaintiff had resisted defendant, his resistance would have arisen in a context in which defendant had not identified himself as an officer. Defendant testified that he did not have time to announce himself as an officer, but he stated that plaintiff addressed him as officer.

[4] The court in *Baird*, 576 F3d at 346-347, cataloged these cases:

> Other circuits have also held that pointing guns at persons who are compliant and present no danger is a constitutional violation. See, *e.g., Motley v. Parks,* 432 F.3d 1072, 1089 (9th Cir. 2005) (*en banc*) (holding an infant at gunpoint constitutes excessive force); *Robinson v. Solano County,* 278 F.3d 1007, 1015-16 (9th Cir. 2002) (*en banc* ) (pointing a gun at an unarmed suspect who poses no danger constitutes excessive force); *Holland v. Harrington,* 268 F.3d 1179, 1192-93 (10th Cir. 2001) (holding children at gunpoint after the officers

The evidence supported a finding that defendant exceeded acceptable force by pointing his gun at plaintiff and holding it against plaintiff's head although plaintiff did not pose a threat of danger. Switching the gun from the ready-low position to holding it directly against plaintiff's head exceeded the reasonable force used in *Dorsey*, 517 F3d 389, to control two suspects who failed to comply with the officer's commands. Further, plaintiff did not pose an imminent threat of harm because he was compliant and not in possession of a weapon.

Defendant nonetheless argues that plaintiff posed a safety threat because of the possibility that there was a weapon in the SUV. Defendant testified that when he and Pomeroy were approaching the SUV they saw Cureton "bent forward within his seat and appeared to be reaching towards the lower back area." Defendant believed that this motion "was consistent with somebody reaching for a gun." However, defendant's argument ignores his testimony that he did not know when he first saw plaintiff that he had any connection with the SUV. Further, the mere possibility that plaintiff may have been carrying a weapon did not justify defendant pressing a gun against plaintiff's head and pushing him against a vehicle. Significantly, that conduct continued even *after* defendant had searched plaintiff and found no weapon.

With respect to the second inquiry, a recent decision from the Sixth Circuit establishes that it has long been clearly established that an officer may not point a gun at cooperating suspect who does not pose a safety threat. In *Vanderhoef v Dixon*, ___ F3d ___ (CA 6, 2019) (No. 18-5993), an off-duty officer was involved in an accident, after which he approached the other vehicle with his gun drawn, directed the passengers out of the vehicle while yelling, "Let me see your hands, get on the ground." The officer pointed his gun at the plaintiff's head for roughly 2 minutes. *Id*. at ___; slip op at 2. The Sixth Circuit held that the officer's conduct was unreasonable under the Fourth Amendment and that he was not entitled to qualified immunity. After reviewing the relevant caselaw, the court concluded: "At the time of this accident and confrontation defendant should have known that pointing his gun at plaintiff—a nonfleeing

---

had gained complete control of the situation "was not justified under the circumstances"); *Baker v. Monroe Township,* 50 F.3d 1186, 1193-94 (3d Cir. 1995) (detention at gunpoint violated the Fourth Amendment as there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used") . . . .

Conversely, courts do not find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to police. See, *e.g., Aponte Matos v. Toledo Davila,* 135 F.3d 182, 191-92 (1st Cir. 1998) (individual attempted to enter house that was being searched for weapons); *Sharrar v. Felsing,* 128 F3d 810, 822 (3d Cir. 1997) (suspect was believed to have a handgun); *Edwards v. Giles,* 51 F.3d 155, 156-57 (8th Cir. 1995) (suspect fled police); *Courson v. McMillian,* 939 F.2d 1479, 1496 (11th Cir. 1991) (drug crime suspects outnumbered police officer, were intoxicated, and one was verbally aggressive); *Collins v. Nagle,* 892 F.2d 489, 495-97 (6th Cir. 1989) (individual approached scene in which officers were dealing with uncooperative suspects).

teenager whom he did not reasonably suspect of any prior crime beyond speeding and reckless driving—and holding him at gunpoint for roughly two minutes, violated plaintiff's Fourth Amendment rights." *Id*. at ___; slip op at 11.

Although the court framed the specific right at issue in relation to a traffic violation, the caselaw supporting the court's decision is not so confined. *Vanderhoef* first cited the general principled established in *Graham*, 490 US 386, that a use of force violated the Fourth Amendment "if it is excessive under objective standards of reasonableness." *Id*. at ___ ; slip op at 8 (quotation marks and citations omitted). The court then focused on caselaw establishing that holding a suspect at gunpoint is unlawful in the absence of provocation. The court primarily relied on *Binay v Betterndorf*, 601 F3d 640 (CA 6, 2010), in which officers executing a narcotics search warrant forced the occupants onto the floor at gunpoint and handcuffed them for the duration of the one-hour search that found no drugs. In that case, the court ruled that the alleged conduct was excessive because the plaintiffs "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee," and the officers did not anticipate that the occupants had firearms. *Id*. at 650. The court held that the officers were not entitled to qualified immunity because "they were on notice that their detention of Plaintiffs during the search using means that were more forceful than necessary would constitute a Fourth Amendment violation." *Id*. at 652. *Vanderhoef* also examined caselaw from other federal court of appeals holding that officers were not entitled to qualified immunity when they unnecessarily pointed guns at nonthreatening suspects:

> The First Circuit has held that "[a] reasonably competent officer also would not have thought that it was permissible to point an assault rifle at the head of an innocent, non-threatening, and handcuffed fifteen-year-old girl for seven to ten minutes, far beyond the time it took to secure the premises and arrest and remove the only suspect." *Mlodzinski v. Lewis*, 648 F.3d 24, 37–38 (1st Cir. 2011). In *Baird v. Renbarger*, the Seventh Circuit ruled that it was unconstitutional when the defendant "pointed a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting. The Fourth Amendment protects against this type of behavior by the police." 576 F.3d 340, 346 (7th Cir. 2009). [*Vanderhoef*, ___ F3d at ___; slip op at 10.]

The events in this case took place in 2013, after the decision in *Binay* and nearly all of the caselaw relied on in *Vanderhoef*. Thus, it was clearly established at the time of defendant's conduct that an officer may not hold a cooperating suspect at gunpoint unless the suspect presents a threat of harm to the officer. As discussed, plaintiff did not present a safety threat to defendant. Plaintiff was exiting a gas station with a water bottle in his hand. He complied with all of defendant's directives. And the crime that plaintiff was suspected of—unarmed robbery of a cell phone—did not present an imminent threat to defendant. Even assuming that defendant had reason to believe that plaintiff was carrying a gun, it would not justify the force that defendant chose to employ, i.e., pushing plaintiff against a vehicle and pressing a gun against the back of his head for an extended period of time. Nor was it objectively reasonable for defendant to continue to use that force after he determined that plaintiff was not carrying a weapon. Further, given that ample caselaw detailing how merely pointing a gun at a nonthreatening

suspect can constitute excessive force, defendant had fair notice that the force he allegedly employed in this case was unlawful.

Plaintiff also had a clearly established right to not have an officer attempt to run him over with a vehicle. This event occurred after defendant and Pomeroy released plaintiff, thus making it gratuitous and unjustifiable. In *McDonald v Haskins*, 966 F2d 292, 295 (CA 7, 1992), the court held that it should have been "obvious" to the defendant officer that holding a gun to the head of a nine-year-old child and threatening to pull the trigger was "objectively unreasonable given the alleged absence of any danger to Haskins or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat." With respect to the second inquiry, the absence of a "precisely analogous case" did not defeat the plaintiff's claim because the defendant's behavior was "so egregious that no like case is on the books." *Id.* at 295. Similarly, defendant's conduct in attempting to run over suspects that he decided to release rather than place under arrest is patently unreasonable. Further, the evidence that defendant bent his license plate to conceal it from view before attempting to run over the suspects and drive away supports an inference that defendant knew that his conduct was unlawful.

Defendant argues that plaintiff's evidence of physical injury is insufficient to support his claim of excessive force. In *Morrison v Bd of Trustees of Green Twp*, 583 F3d 394 (CA 6, 2009), the court observed that "an excessive use of force claim *may* be established through evidence of severe injury or physical contact," but held that it is "not required that this *must* be the case." Rather, "a plaintiff may 'allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage.' " *Id.*, quoting *Ingram v City of Columbus*, 185 F3d 579, 597 (CA 6, 1999). " 'Gratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial." *Morrison*, 583 F3d at 407. Additionally, pointing a gun can constitute excessive force even where it is a mere show of force, not resulting in physical contact with the plaintiff. *Dorsey*, 517 F3d 389. Therefore, the evidence of lack of injury to plaintiff does not prevent him from prevailing on his claim.

For these reasons, we conclude that the trial court did not err by ruling that there were genuine issues of material fact sufficient to defeat defendant's claim of qualified immunity.

Affirmed.

/s/ Karen M. Fort Hood
/s/ David H. Sawyer

-9-